UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CATHERINE A. PAGE, as Parent and Natural Guardian
on behalf of BRITTANY, Infant; and MELISSA, Infant,

                    Plaintiffs,

   -against-                                                          1:02-CV-0526
                                                                                       (LEK/RFT)

PATRICIA MONROE, M.D., ADIRONDACK INTERNAL
MEDICINE AND PEDIATRICS, P.C., *et al*

                    Defendants/Cross-Plaintiffs,
   -against-

RANDY QUAYLE, PH.D., Individually, ROBERT
SCHILLER, Individually, LAKE PLACID CENTRAL
SCHOOL DISTRICT, ST. AGNES SCHOOL, DIOCESE
OF OGDENSBURG, NANCY LEWIS, Individually,
CRISIS CENTER OF CLINTON, ESSEX AND
FRANKLIN COUNTIES, INC., JULIE FERGUSON,
Individually, THE COUNTY OF ESSEX, NEW YORK,
ESSEX COUNTY MENTAL HEALTH, ESSEX
COUNTY DEPARTMENT OF SOCIAL SERVICES, and
ESSEX COUNTY CHILD PROTECTIVE SERVICES,

                    Cross-Defendants.
_____

## MEMORANDUM-DECISION AND ORDER[1]

      This case concerns the "mandatory reporter" system of New York State, through which certain professionals are required to report suspected child abuse to the Statewide Central Register of Child Abuse and Maltreatment ("State Central Register" or "hotline").[2] Plaintiffs are two

---

[1] For printed publication by the Federal Reporters.

[2] The New York State Office of Children and Family Services maintains a hotline, 24 hours a day, seven days a week, to receive telephone calls alleging child abuse or maltreatment in New York State. N.Y. SOC. SERV. LAW §422 (MCKINNEY 2007). The hotline receives calls from mandated

1

children who allege that Defendants Dr. Patricia Monroe ("Dr. Monroe") and Adirondack Internal Medicine and Pediatrics, P.C. ("Adirondack") breached their duty to take steps to identify and report abuse that they were suffering and that Defendants' breach of this duty resulted in harm to Plaintiffs.

## I. Background

On August 15, 2000, Catherine Page ("Ms. Page"), the mother of Plaintiffs Brittany and Melissa ("Plaintiffs" or "Brittany" and "Melissa") (at the time, ages nine (9) and seven (7) respectively) read an excerpt of Brittany's diary, in which Brittany recounted that she had "been touched in places [she didn't] want to be touched." Complaint (Dkt. No. 1) at ¶ 31. Brittany then told her mother that her half-brother Anthony (age 14) had touched her genitals, over her clothes, on more than one occasion when he had first moved into the family home, a year prior. Id.; Page Depo. (Dkt. No. 81, Attach. 2, Ex. A) at 60-61.

Ms. Page then confronted Anthony, who claimed that he did not remember touching Brittany inappropriately, though if he did, it was accidental. Page Depo. (Dkt. No. 81, Attach. 2, Ex. A) at 61-62. Ms. Page thought that it was possible that Anthony was telling the truth and the touching was accidental. Id. at 62. However, because Ms. Page "wasn't going to sit and let it, you know, happen again without trying to do something," in case the touching was not accidental, she called

---

reporters, persons such as doctors, teachers, and social workers who are required by law to report suspected cases of child abuse, and members of the public, who are not required to do so. Id.; New York State Office of Children and Family Services, Child Protective Services, http://www.ocfs.state.ny.us/main/cps/ (last visited May 9, 2007). If the Child Protective Specialist who answers the call determines the allegations warrant registering a report, the Child Protective Service Unit of the local department of social services conducts an investigation. http://www.ocfs.state.ny.us/main/prevention/faqs.asp#after_report (last visited May 9, 2007). See also N.Y. SOC. SERV. LAW §415 (MCKINNEY 2007).

2

the hotline. Id. at 65. The hotline staff told Ms. Page that a report could not be registered, because the situation she described was not child abuse or maltreatment under the terms of New York Social Services Law, as Anthony, the perpetrator of the sexual abuse, could not be the subject of a report. Id. at 66.

New York Social Services Law defines the "subject" of a report to be:

"any parent of, guardian of, custodian of or other person eighteen years of age or older legally responsible for...a child reported to the central register of child abuse and maltreatment who is allegedly responsible for causing injury, abuse or maltreatment to such child or who allegedly allows such injury, abuse or maltreatment to be inflicted on such child."

N.Y. Soc. Serv. Law §412 (4) (McKinney 2007). Anthony was not legally responsible for his sisters' care; that responsibility lay in the hands of Ms. Page, their mother. Accordingly, Anthony could not be the subject of a report. New York has established, for policy reasons, that "[o]rdinarily, the State would not need to intervene when a minor is abusing a sibling," because such a situation is within the capacity and authority of a fit parent. Catherine G. v. County of Essex, 3 N.Y.3d 175, 180 (2004). However, as Section 412(4) indicates, a report is properly made against a parent who commits such abuse, or *allows* it to take place. N.Y. Soc. Serv. Law §412 (4) (McKinney 2007). This does not encompass every parent whose child was abused; there must be a showing that the parent or guardian failed to exercise a minimum degree of care, such as failing to take any appropriate action to protect their child to establish that they allowed the abuse to happen. See In re Mary S., 720 N.Y.S.2d 568, 569-70 (App. Div., 3d Dep't. 2001) (noting that respondent's characterization of the friend's criminal sexual conduct with [her child] as "just fooling around" demonstrates that her "understanding of the duties associated with caring for [her] children was fundamentally flawed") (quoting Matter of Nathaniel TT., 696 N.Y.S.2d 274, 277 (App. Div., 3d.

3

Dep't 1999)). If the parent is responding appropriately and acting to prevent harm to their child, then there is no grounds for a report and no justification for state involvement. See Robbins Depo. (Dkt. 81, Attach. 19, Ex. I2) at 56, 57-8 (noting that a report is not usually appropriate when a parent is attempting to remedy the situation).

As the situation described to the hotline staff could not legally justify a report, the hotline staff instead recommended that Ms. Page contact a local agency to obtain services for her children. Page Depo. (Dkt. No. 81, Attach. 2, Ex. A) at 66. Ms. Page then called the Essex County Mental Health Department, inquiring about services for Brittany and Anthony, and left her name for a call back. Id. at 67-68.

After that call, Ms. Page called Dr. Monroe, a pediatrician at Adirondack Internal Medicine and Pediatrics, P.C., who had treated Plaintiffs, as well as Anthony, in the past. Id. at 65, 69; Medical Records (Dkt. No. 81, Ex. C1). Ms. Page told Dr. Monroe what Brittany had alleged and Anthony's response. Page Depo. (Dkt. No. 81, Attach. 2, Ex. A) at 69. Ms. Page also told Dr. Monroe of her call to Essex County Mental Health Department, and possibly of the call to the State Central Register, as well. Id. at 70. Ms. Page also told Dr. Monroe that Brittany would be staying at her aunt's house for the next week. Monroe Depo. (Dkt. No. 81, Attach. 8, Ex. B) at 53-54. Dr. Monroe did not make a report to the state central register in response to the information Ms. Page told her. Id. at 62. While completing her pediatric residency in 1994, Dr. Monroe had undergone a training outlining her duties as a mandated reporter. Id. at 11-13. Dr. Monroe testified that she did not make a report because the sexual contact "was not a reportable incident...because the alleged touching was not done by someone who had a supervisory role over the child." Id. at 46. Additionally, according to her testimony, Dr. Monroe felt that Brittany would be safe from then on,

as her mother was taking care of her.  Id. at 74.

Instead, Dr. Monroe advised Ms. Page not to leave Brittany and Anthony alone.  Page Depo. (Dkt. No. 81, Attach. 2, Ex. A) at 69-70.  Dr. Monroe also asked Ms. Page to bring Brittany in, if Brittany would be willing to speak to Dr. Monroe about the inappropriate touching.  Id. at 72-73  However, Ms. Page did not bring Brittany to the office because Brittany did not want to go and did not want to speak to Dr. Monroe about the incidents of sexual touching.  Id.  Ms. Page told Dr. Monroe that, although Brittany would not speak to Dr. Monroe about the incidents, Brittany would speak to a therapist.  Id.  Dr. Monroe saw Brittany several times that fall and winter to treat medical complaints, but did not discuss with Brittany the allegations from the August 16 phone call.  Medical Records (Dkt. No. 81, Ex. C1).

On February 1, 2001, Dr. Monroe received a phone call from the New York State Police, asking if she would examine Brittany and Melissa, in relation to possible sexual abuse.  Id.  Ms. Page brought Plaintiffs to Dr. Monroe's office and told Dr. Monroe that Plaintiffs had just disclosed additional and more severe instances of sexual abuse against them, committed by their half-brother Anthony.  Id.  Dr. Monroe confirmed the stories with Plaintiffs and physically examined them.  Id.  At that time, Ms. Page told Dr. Monroe that she had begun working nights and leaving the children with a 19-year old babysitter.  Id.  On February 6, 2001, Dr. Monroe reported Ms. Page to the State Central Register for failure to supervise the children adequately.  Id.

Plaintiffs allege that Dr. Monroe violated her statutory duty to report the abuse, in that she had reasonable cause to suspect that Ms. Page was allowing the abuse to happen.  Plntfs' Mem. of Law (Dkt. No. 119) at 8.  They also allege that Dr. Monroe was negligent in failing to identify the extent of the abuse or conduct physical evaluations that would have allegedly revealed the extent of

5

the abuse at an earlier date. Id. at 17.  Both of these failures allegedly resulted in significant harm to Plaintiffs in that the abuse continued undetected.  Plaintiffs additionally name Adirondack as a defendant, on theories of negligent supervision and training, *respondeat superior*, and that Adirondack also bears the statutory duties of a mandated reporter.

Plaintiffs originally named several other defendants in their complaint, including Lake Placid Central School District, St. Agnes School, the Crisis Center of Clinton, Essex, and Franklin Counties, Inc., the County of Essex, Essex County Mental Health, Essex County Department of Social Services, and Essex County Child Protective Services, as well as individual employees of those entities.  The claims against those former defendants were, like those against Dr. Monroe and Adirondack, based on their failure to make reports to the State Central Register, after Ms. Page alerted them to the possibility of inappropriate sexual conduct.  However, the claims as to all defendants (and cross-claims between all defendants) except Dr. Monroe and Adirondack were discontinued by stipulation. Stipulation (Dkt. No. 56).  The cross-claims that now remain are claims for indemnification by Dr. Monroe and Adirondack against the former defendants.

Additionally, Plaintiffs (joined by Ms. Page) had brought a claim, based on the same facts, in New York State Court, naming most of the former defendants, but not Dr. Monroe or Adirondack, as parties. Catherine G. v. County of Essex, 761 N.Y.S.2d 727 (N.Y. App. Div., 3d Dep't. 2003).  In that case, Plaintiffs alleged that the county and school defendants violated their statutory duty to make a report against Anthony. Catherine G., 3 N.Y.3d at 178-9.  The New York Court of Appeals found that Plaintiffs' claims were "patently without merit" in that no proper report could have been made against Anthony and, accordingly, the defendants did not have a duty to make such a report. Id. at 181.  The matter currently before the Court differs in several ways from

that case: 1) different defendants are named, 2) Plaintiffs assert a claim for medical malpractice, as well as violation of statutory duties, and 3) Plaintiffs (no longer joined by Ms. Page, although she remains their representative) argue that, even if a report could not have properly been made against Anthony, Defendants had a duty to make a report against Ms. Page, for allowing the abuse to have occurred.[3]

Currently before the Court are Motions for summary judgment filed by Plaintiffs and Defendants, Cross-Motions to dismiss filed by the third party Defendants, and a Motion to withdraw Ms. Page as Plaintiffs' representative and replace her with Plaintiffs' older sister, Elizabeth Mitrione. The Court will first address Defendants' Motion for summary judgment.

## II. Discussion

**A.     Claims against Dr. Monroe**

1.     Summary Judgment Standard

Summary judgment is proper when "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(C); Town of Southold v. Town of E. Hampton, 477 F.3d 38, 46 (2d Cir. 2007); Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 478 (2d Cir. 1996) ("if a reasonable trier of fact could reach a different conclusion, the District Court may not properly resolve that issue in summary judgment"). In applying this standard, courts must "'resolve all ambiguities, and credit all factual inferences that could rationally

---

[3] When dismissing Plaintiffs' claims, the New York Court of Appeals noted that, although the defendants had no duty to make a report on the facts before the court, a duty would have arisen if there had been evidence that the person legally responsible, the children's mother, had "allowed" the abuse to happen, by failing to take measure to protect her daughters. Catherine G., 3 N.Y.3d at 180. Plaintiffs now assert that such evidence was before Dr. Monroe and Adirondack.

be drawn, in favor of the party opposing summary judgment.'" Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (quoting Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)).

    2.    Claims for Violation of Statutory Duties

Section 413 of New York Social Services Law requires certain professionals, such as medical personnel and teachers, to make a report to the State Central Register when they have reasonable cause to suspect child abuse or maltreatment. N.Y. SOC. SERV. LAW § 413 (MCKINNEY 2007). A person or institution who is required to report suspected child abuse or maltreatment and knowingly and willfully fails to do so can bear civil liability. N.Y. SOC. SERV. LAW § 420 (2) (MCKINNEY 2007); Ingrao v. County of Albany, 1:01-cv-730 (TJM/DRH), 2006 U.S. Dist. LEXIS 70935, at 22-24 (N.D.N.Y. Sept. 29, 2006) (McAvoy, Senior D.J.). For Plaintiff's claim against Dr. Monroe for violating her statutory duties as a mandatory reporter to succeed, a reasonable juror must be able to conclude that Dr. Monroe's failure to report Ms. Page was willful and knowing and that that failure caused Plaintiffs harm. This Court finds that no reasonable juror could so conclude.

    a.    Knowing and Willful Requirement

Plaintiffs never allege that Dr. Monroe's failure to report was knowing and willful. Instead, they allege that Dr. Monroe had reasonable cause to suspect that Plaintiffs were abused or neglected children and thus should have suspected, even if she did not. Even if Plaintiffs were able to show that there was reasonable cause to suspect abuse, that showing is insufficient as a matter of law to establish civil liability under section 420(2) of New York Social Services Law. Bowes v. Noone, 748 N.Y.S.2d 440, 442 (App. Div., 4th Dep't. 2002) (a failure to report abuse which was not willful is not actionable even if there had been reasonable cause to suspect abuse). There is absolutely no evidence in the record to support a finding that Dr. Monroe's failure to report was knowing and

willful. In fact, all evidence indicates that she did not believe Plaintiffs were abused children under the terms of the statute.

b. Duty to Report

Plaintiffs correctly notes that section 413 requires physicians, or other mandated reporters, to notify the State Central Register when a "parent...comes before them in their professional ...capacity and states from personal knowledge facts, conditions or circumstances which, if correct, would render the child an abused or mistreated child." However, Plaintiffs are incorrect in arguing that this situation arose before Dr. Monroe. The record, taken in the light most favorable to Plaintiffs, shows that the circumstances Ms. Page described to Dr. Monroe did not make Plaintiffs abused or neglected children. As the New York Court of Appeals noted, in describing this same situation, in the absence of evidence that Ms. Page was incapable or unwilling to protect her daughters, there was no duty to report and claims to the contrary are "patently without merit." Catherine G., 3 N.Y.3d at 180-81.

The record does not show that any such evidence arose until February 2001, when the more serious allegations of sexual misconduct arose and Dr. Monroe did file a report. The record shows that, before that point, Dr. Monroe had no reason to view Ms. Page as having allowed the conduct to happen. The information Defendant had "reveals a mother who, as the person in charge of the household, appeared to be taking responsible measures to protect her daughters and obviate the need for governmental intervention." Id. Ms. Page told Dr. Monroe that she had taken steps to obtain professional assistance for her children and that she did not and would not leave the children unattended. The only potentially contrary evidence, Ms. Page's decision not to bring Brittany to Dr. Monroe's office, is not sufficient to find reasonable cause to suspect child abuse. Dr. Monroe knew

that Ms. Page made this decision in consideration of Brittany's preferences.  Page Depo. (Dkt. No. 81, Attach. 3, Ex. A2) at 72-73.  Accordingly, Plaintiff has not shown that the duty to report arose, let alone that the failure to report was knowing and willful.

For the foregoing reasons, Plaintiffs' claims of negligence based on a violation of Dr. Monroe's statutory duties as a mandatory reporter must fail as a matter of law.

### 3. Claims for Medical Malpractice

Plaintiffs' second claim alleges that Dr. Monroe committed medical malpractice in taking a "passive" approach to the issue of possible sexual abuse.  To be successful on this claim, Plaintiff must be able to raise a triable issue of fact as to whether Dr. Monroe breached her duty of care to Brittany or Melissa and, as a consequence, caused injury to Plaintiffs.  Bowman v. Chasky, 817 N.Y.S.2d 153, 153-54 (App. Div., 2d Dep't. 2006).  As discussed below, Plaintiffs do not meet this burden.

Plaintiffs' allegations are rooted in the claim that Dr. Monroe should have discovered that Ms. Page was unable to protect her daughters and taken more steps to prevent the abuse prior to February 2001.  Even if Plaintiffs were able to show that Dr. Monroe's actions constituted a breach of the duty of care, they are not able to show that this failure was the proximate cause of injury suffered by Plaintiffs.  Accordingly, their claims against Dr. Monroe must fail.  Prete v. Rafla-Demetrious, 638 N.Y.S.2d 700, 702 (App. Div., 2d Dep't. 1996) (holding that a plaintiff's claim cannot survive without proof that her negligence was a proximate cause of her injuries).

#### a. Injury Analysis

It is undisputed that Plaintiffs were injured as a result of the abuse they suffered at the hands of their half-brother.  Additionally, it is undisputed that a delay in discovering and stopping the

abuse would increase the injury suffered by a victim of sexual abuse. However, Plaintiffs cannot establish that an earlier report to the State Central Register or an earlier genitourinary exam, the specific omissions on which Plaintiffs base their claim, would have prevented this injury. In fact, all the evidence provided indicates that neither a full genitourinary examination nor a report to the State Central Registry would have resulted in an earlier discovery of the ongoing sexual abuse.

### i. Genitourinary Exam

The record reveals that Brittany's full physical exam conducted on February 6, 2001 revealed no bruising, bleeding or laceration. Medical records (Dkt. No. 81, Attach. 10, Ex. C) at 10-11. According to Dr. Monroe's medical records, the only abnormality found was a notched hymen. Id. Plaintiffs' expert, Dr. Jennifer Cantor, testified that a notched hymen "may be," but is not necessarily, indicative of sexual abuse. Cantor Depo. (Dkt. No. 114, Attach. 5) at 129. See also Cantor Depo. (Dkt. No. 114, Attach. 4) at 114 (noting, after consideration of the record of the February 6, 2001 examination, "[a] notch when at a specific location, which would not be at the location on this picture, may be an indicator of prior trauma."). This evidence does not support Plaintiff's claim that an earlier exam would have revealed the extent of the abuse and prevented injury.

### ii. Report to State Central Register

From the time of Brittany's disclosure to her mother in August 2000 until February 2001, there were at least four (4) separate reports made about her to the State Central Register. Each of those reports was rejected because the abuse suffered by Brittany was not properly reportable. Deft's Mem. of Law (Dkt. No. 81). When Dr. Monroe did call in a report in February 2001, after the disclosure of more serious abuse, the local Child Protective Services worker, Ann Robbins,

11

found that the report was unfounded, in that there was no credible evidence that Ms. Page did anything wrong. Robbins Depo. (Dkt. No. 81, Attach. 18, Ex. I) at 47. Considering the consistent result of those reports made during the relevant period of time, there is no basis to believe that if Dr. Monroe had decided to make a report before February 2001 anything would have changed for Plaintiffs. The Court of Appeals noted, in analyzing these facts, "there is no reason to suppose a report... to the state hotline would have changed anything.... It is safe to say that an earlier visit [to the home by a state Child Protective Services worker] would not have prevented any abuse even if it had taken place [in the fall of 2000]." Catherine G., 3 N.Y.3d at 181. Because Plaintiffs cannot establish that Dr. Monroe's omissions proximately caused injury to Plaintiffs, their claims against her must fail.

      b.    Duty Analysis

Even if there had been some factual link between Dr. Monroe's actions and the injury suffered by Plaintiffs between August 2000 and February 2001, Dr. Monroe would not be subject to liability, as no reasonable trier of fact could find that, by choosing not to take the steps Plaintiffs claim were necessary, Dr. Monroe failed to meet her professional duty of care. The scope of a duty of care owed by an alleged tortfeasor is "in the first instance, a legal question for the courts to resolve." Alfaro v. Wal-Mart Stores, Inc., 210 F.3d 111, 114 (2d Cir. 2000). The scope of the duty owed is determined "by balancing factors, including the reasonable expectations of parties and society generally, the proliferation of claims, the likelihood of unlimited or insurer-like liability, disproportionate risk and reparation allocation, and public policies affecting the expansion or limitation of new channels of liability." Id. (quoting Palka v. Servicemaster Mgmt. Servs. Corp., 83 N.Y.2d 579, 586 (1994)). In determining the scope of a duty, "[d]espite often sympathetic facts in a

particular case before them, courts must be mindful of the precedential, and consequential, future effects of their rulings, and limit the legal consequences of wrongs to a controllable degree." Lauer v. City of New York, 95 N.Y.2d 95, 100 (2000) (internal citations and quotations omitted). With these considerations in mind, this Court cannot find that it is a doctor's duty to make a report against a parent of sexually abused children or undertake independent investigations when a parent is taking responsible steps to protect her children. See Catherine G., 3 N.Y.3d at 180; Troxel v. Granville, 530 U.S. 57, 68-69 (2000) ("[S]o long as a parent adequately cares for his or her children (i.e., is fit), there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.").

      Expanding the scope of a physician's duty in such a way is neither consistent with the state child protective system nor appropriately respectful of a parent's autonomy.  The statutory definitions of abused or maltreated children excludes those children who have suffered abuse by another child or by an adult who is not the primary caretaker.  This is because, in such situations, "[p]arents would usually be the ones to take action." Catherine G., 3 N.Y.3d at 180.  The default under this system is that primary responsibility for preventing child abuse lies with the parents, not mandatory reporters. See Prince v. Massachusetts, 321 U.S. 158, 166 (1944) ("[i]t is cardinal with us that the custody, care and nurture of the child reside first in the parents").  Unless a parent reveals herself to be incapable or unwilling to act to protect her children, she cannot be the subject of a report because her children have been victimized.  To hold that a report not only could have been made, but needed to have been made, without such a showing, would be to fundamentally alter the balance of authority between parents and the state.

13

This case is a fine example that "[w]hile the temptation is always great to provide a form of relief to one who has suffered, it is well established that the law cannot provide a remedy for every injury incurred." Pingtella v. Jones, 758 N.Y.S.2d 717, 721 (App. Div., 4th Dep't. 2003). This Court is sympathetic to Plaintiffs' suffering, but it cannot ignore the "far-reaching effect" and policy implications of expanding liability to cover such a situation. Id. For the foregoing reasons, Plaintiffs' negligence claims against Dr. Monroe must be dismissed.

**B.     Claims against Adirondack**

As noted above, Plaintiffs also assert claims against Adirondack on both theories of vicarious liability and violation of statutory duties as a mandatory reporter. Because it has already been determined that Dr. Monroe's actions or omissions were not negligent, none of the claims asserting Adirondack's vicarious liability can succeed. Additionally, the claims against Adirondack for violation of statutory duties as a mandatory reporter also must fail. As described above, liability only attaches if a failure to report is willful and knowing. Plaintiff has not made any allegations that this standard was met with regards to Adirondack or presented any facts supporting such a claim. Consequently, Plaintiffs' claims against Adirondack cannot succeed.

**C.     Cross-Claims**

For the reasons described above, Dr. Monroe and Adirondack bear no liability in this case. Accordingly, their cross-claims for contribution and indemnification, which were prefaced on a finding of liability, are now moot and will be dismissed.

### III. Conclusion

Based on the foregoing discussion, it is hereby

**ORDERED**, that Defendants' Motion for summary judgment (Dkt. No. 81) is **GRANTED**;

and it is further

**ORDERED**, that Plaintiffs' Complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED**, that Plaintiffs' Motion to withdraw Catherine Page as representative (Dkt. No. 95) is **DENIED AS MOOT**; and it is further

**ORDERED**, that Defendants' Cross-Claims (Dkt. No. 15) are **DISMISSED AS MOOT**; and it is further

**ORDERED**, that Third-Party Defendants' Cross-Motions to dismiss and for judgment as a matter of law (Dkt. Nos. 82, 102, 104, 108, and 124) are **DISMISSED AS MOOT**; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED**.

DATED:   May 16, 2007
         Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge