UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CATHERINE A. PAGE, as Parent and Natural Guardian
on behalf of BRITTANY, Infant; and MELISSA, Infant,

                              Plaintiffs,

        -against-                                        1:02-CV-0526 (LEK/ RFT)

PATRICIA MONROE, M.D., and ADIRONDACK
INTERNAL MEDICINE AND PEDIATRICS, P.C.,

                              Defendants/Cross-Plaintiffs,

        -against-

RANDY QUAYLE, PH.D., Individually, ROBERT
SCHILLER, Individually, LAKE PLACID CENTRAL
SCHOOL DISTRICT, ST. AGNES SCHOOL, DIOCESE
OF OGDENSBURG, NANCY LEWIS, Individually,
CRISIS CENTER OF CLINTON, ESSEX AND
FRANKLIN COUNTIES, INC., JULIE FERGUSON,
Individually, THE COUNTY OF ESSEX, NEW YORK,
ESSEX COUNTY MENTAL HEALTH, ESSEX
COUNTY DEPARTMENT OF SOCIAL SERVICES, and
ESSEX COUNTY CHILD PROTECTIVE SERVICES,

                              Cross-Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

        Plaintiffs filed their Complaint in this matter on April 16, 2002, asserting claims of medical

malpractice and breach of Defendants' statutory duty to report child abuse under New York's

mandatory reporter system.  Compl. (Dkt. No. 1).[1]  On May 16, 2007, this Court granted

_____

[1] Plaintiffs' Complaint originally named all Cross-Defendants as Defendants in this action.
However, Plaintiffs later stipulated to discontinue their claims against all parties except Patricia
Monroe, M.D. and Adirondack Internal Medicine and Pediatrics, P.C.  Dkt. Nos. 45, 57.

Defendants' Motion for summary judgment.  Order (Dkt. No. 151).  On December 23, 2008, the

Second Circuit Court of Appeals issued a Mandate affirming the dismissal of Plaintiffs' claims

regarding Defendants' statutory duty to report, but reversing as to Plaintiffs' medical malpractice

claims.  Mandate (Dkt. No. 165).

Presently before the Court are Motions brought by all Cross-Defendants, seeking summary

judgment as to the Cross-Claims asserted against them by Defendants.  Also pending are Cross-

Motions for costs and attorney's fees brought by Cross-Defendants Julie Ferguson, Individually; the

County of Essex, New York; Essex County Mental Health; Essex County Department of Social

Services; and Essex County Child Protective Services (collectively, "the County Cross-

Defendants") as well as Lake Placid Central School District; Randy Quayle, individually; and

Robert Schiller.  For the reasons discussed below, the Motions for summary judgment brought by all

Cross-Defendants are granted.  The Motions for costs and attorney's fees are denied.

## I.       BACKGROUND

For purposes of clarity, the Court will first provide an overview of Plaintiffs' claims against

Defendants.  The Court will then provide details regarding the Cross-Defendants' involvement in

this matter in the next section.

On August 15, 2000, Catherine Page ("Ms. Page"), the mother of Plaintiffs Brittany and

Melissa ("Plaintiffs" or  "Brittany" and "Melissa") (at the time, ages nine (9) and seven (7),

respectively) read an excerpt of Brittany's diary, in which Brittany wrote that she was "sad all the

time because I've been touched in places I don't want to be touched."  Compl. ¶ 31.  Brittany then

told her mother that her half-brother Anthony (age 14) had touched her genitals, over her clothes, on

more than one occasion when he had first moved into the family home, a year prior.  Id.; Deposition

of Catherine Page ("Page Dep.") at 60-61 (Dkt. No. 81, Attachs. 1-5, Ex. A).

Ms. Page then confronted Anthony, who claimed that he did not remember touching Brittany inappropriately, though if he did, it was accidental.  Page Dep. at 61-62.  Ms. Page thought that it was possible that Anthony was telling the truth.  Id. at 62.  However, because Ms. Page "wasn't going to sit and let it, you know, happen again without trying to do something" in case the touching was not accidental, she called the New York state hotline for reporting of child abuse or maltreatment ("the Hotline").  Id. at 65.  The Hotline staff told Ms. Page that they would not even take her name to register a report, because the situation was not a matter that they could handle.  Id. at 66.

Ms. Page called Patricia Monroe, M.D. ("Dr. Monroe"), a pediatrician at Adirondack Internal Medicine and Pediatrics, P.C., who had treated Plaintiffs, as well as Anthony, in the past.  Page Dep. at 68-69; Medical Records (Dkt. No. 81, Attach. 10, Ex. C1).  Ms. Page told Dr. Monroe what Brittany had alleged and Anthony's response.  Page Dep. at 69.  Ms. Page also told Dr. Monroe that Brittany would be staying at her aunt's house for the next week.  See Deposition of Patricia Monroe, M.D. ("Monroe Dep.") at 53-54 (Dkt. No. 81, Attach. 8, Ex. B).  Dr. Monroe advised Ms. Page not to leave Brittany alone with Anthony.  Page Dep. at 69-70.  Dr. Monroe also asked Ms. Page to bring Brittany in if Brittany would be willing to talk to Dr. Monroe.  Id. at 72.  Ms. Page did not do so because Brittany did not want to go.  Id. at 72-74.

On or about January 31, 2001, after Brittany reacted angrily to Anthony's suggestion that he accompany her down the street on an errand, Ms. Page "knew that something had happened" and talked to Plaintiffs as well as her other daughters living in the house.  Page Dep. at 76-79.  The next day, Page called the Hotline, and was again told that there was nothing they could do.  Id. at 79.

3

Ms. Page again questioned Anthony, but he denied any inappropriate contact with his sisters.  Id. at

79-80.  Ms. Page called numerous agencies, and also called Dr. Monroe, who asked Ms. Page to

bring Plaintiffs in for an examination.  Id. at 80-82.  The state police had also contacted Dr. Monroe

and asked her to evaluate Brittany for suspected sexual abuse.  Monroe Dep. at 99.

Ms. Page brought Plaintiffs to Dr. Monroe's office and told Dr. Monroe that Plaintiffs had

just disclosed additional and more severe instances of sexual abuse against them, committed by

Anthony.  Medical Records at 11.  Dr. Monroe confirmed the stories with Plaintiffs and physically

examined them.  Id. at 9-11.  At that time, Ms. Page told Dr. Monroe that she had begun working

nights and leaving the children with a 19-year old babysitter.  Id. at 11.

Ms. Page brought Anthony to stay at his father's home within two or three days after Ms.

Page confronted Anthony on or about January 31, 2001.  Page Dep. at 85, 88.  Anthony later

admitted having inappropriate contact with Plaintiffs on numerous occasions.  See generally

Deposition of Anthony Mitrone (Dkt. No. 109, Attach. 2).

Per its Mandate dated December 23, 2008, the Second Circuit affirmed the dismissal of

Plaintiffs' claims that Defendants owed a statutory duty to report Ms. Page to the Hotline for

allowing the abuse of her children.  The Second Circuit noted that "at the time of the initial reports

of abuse [in August 2000], Dr. Monroe had no reason to believe that Catherine Page was neglecting

her duty to protect her daughters from abuse."  Mandate at 4.

The Second Circuit reversed this Court's grant of summary judgment for the Defendants as

to Plaintiffs' claims of medical malpractice, noting that

> Page offered evidence that created at least an inference that had Dr. Monroe herself
> contacted the Child Protective Services or law enforcement authorities, those authorities
> would have intervened to stop Anthony's abuse of his half-sisters at some point before

4

> February 2001.  Accordingly, Page has demonstrated a genuine issue of material fact
> with respect to whether Dr. Monroe's alleged deviations from the standard of care were
> the proximate cause of the girls' injuries . . . .

Mandate at 6-7.

Following the Second Circuit's Mandate, all Cross-Defendants have renewed their earlier

Motions for summary judgment/ judgment as a matter of law as to Defendants' Cross-Claims.

## II.    DISCUSSION

## A.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is proper

when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that

there is no genuine issue as to any material fact and that the movant is entitled to judgment as a

matter of law." FED. R. CIV. P. 56(c); Beard v. Banks, 548 U.S. 521, 529 (2006) (citing Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986)).  A court must "'resolve all ambiguities, and credit all

factual inferences that could rationally be drawn, in favor of the party opposing summary

judgment.'" Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (quoting Cifra v. General

Electric Co., 252 F.3d 205, 216 (2d Cir. 2001)).  "Only disputes over facts that might affect the

outcome of the suit under the governing law will properly preclude the entry of summary

judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden of demonstrating that no genuine issue of

material fact exists for trial, the nonmovant "must do more than simply show that there is some

metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,

475 U.S. 574, 586 (1986) (citations omitted).  The nonmovant "must come forth with evidence

sufficient to allow a reasonable jury to find in her favor." Brown, 257 F.3d at 251 (citation

omitted).  The nonmoving party "may not rely merely on allegations or denials in its own pleadings;" bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment.  FED. R. CIV. P. 56(e)(2); see Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991); Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990). "Factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony."  Brown, 257 F.3d at 251 (citation omitted).

**B.    Indemnity**

"Under New York law, '[t]he right to indemnification may arise out of an express agreement of indemnification, or it may be implied by law in favor of one who is held liable solely by imputation of law because of his relation to the actual wrongdoer.'"  In re Del-Val Financial Corp. Securities Litigation, 868 F. Supp. 547, 553 (S.D.N.Y. 1994) (quoting Jordan v. Madison Leasing Corp., 596 F. Supp. 707, 709 (S.D.N.Y. 1984)).  "The key element of a common-law cause of action for indemnification is not a duty running from the indemnitor to the injured party, but rather is 'a separate duty owed the indemnitee by the indemnitor.'"  Raquet v. Braun, 90 N.Y.2d 177, 183 (1997) (quoting Mas v. Two Bridges Assocs., 75 N.Y.2d 680, 690 (1990)).

In their Answer, Defendants asserted Cross-Claims against all Cross-Defendants for indemnity as well as contribution.  Answer (Dkt. No. 15).  However, it appears that Defendants have abandoned their indemnity claims, as Defendants' Responses to the pending Cross-Motions do not address the arguments made by Cross-Defendants regarding indemnity.  See, e.g., Stokes v. City of New York, 2007 WL 1300983, *14 (E.D.N.Y. May 3, 2007) (deeming claim abandoned where

nonmovant's opposition papers did not address movant's arguments for summary judgment as to that claim); Bellegar de Dussuau v. Blockbuster, Inc., 2006 WL 465374, *7 (S.D.N.Y. Feb. 28, 2006) (same).  Even assuming that Defendants did not abandon their indemnity claims, the Court finds no basis in the record for contractual or common law indemnity as to any Cross-Defendant. Therefore, the Motions for summary judgment are granted as to the Cross-Claims for indemnity.

## C.    Contribution

Section 1401 of the Civil Practice Law and Rules of New York provides that, subject to exceptions not applicable to this case, "two or more persons who are subject to liability for damages for the same personal injury . . . may claim contribution among them whether or not an action has been brought or a judgment has been rendered against the person from whom contribution is sought."  CPLR § 1401.  A contribution claim can be brought when the party from whom contribution is sought breached a duty of care owed either to the injured plaintiff or to the defendant (the third-party plaintiff).  See Raquet, 90 N.Y.2d at 182 (citations omitted).  "The critical requirement for apportionment [by contribution] . . . is that the breach of duty by the contributing party must have had a part in causing or augmenting the injury for which contribution is sought." Nassau Roofing & Sheet Metal Co. v. Facilities Dev. Corp., 71 N.Y.2d 599, 603 (1988) (citations omitted).  "[C]ontribution is available whether or not the culpable parties are allegedly liable for the injury under the same or different theories and the remedy may be invoked against concurrent, successive, independent, alternative and even intentional tortfeasors."  Raquet, 90 N.Y.2d at 183 (internal quotations and citations omitted).

Here, Defendants allege that they are entitled to seek contribution from the Cross-Defendants, as the Cross-Defendants were subsequent tortfeasors.  Specifically, Defendants argue

7

that each of the Cross-Defendants had a relationship with Brittany and/or Melissa Page, giving rise to a duty of care which the Cross-Defendants violated, causing or contributing to Plaintiffs' injuries.

Defendants allege that the Cross-Defendants violated their statutory duty to report Ms. Page for failing to protect her daughters from Anthony.  Section 413 of the New York Social Services Law requires certain professionals, such as medical personnel and teachers, to make a report to the State Central Register when they have reasonable cause to suspect child abuse or maltreatment. N.Y. Soc. Serv. Law § 413.  A person or institution who is required to report suspected child abuse or maltreatment and knowingly and willfully fails to do so can bear civil liability.  N.Y. Soc. Serv. Law § 420 (2).  Section 412(4) of the New York Social Services Law provides that a report is properly made against a parent who commits abuse, or *allows* it to take place.  N.Y. Soc. Serv. Law §412 (4).  This does not encompass every parent whose child was abused; there must be a showing that the parent or guardian failed to exercise a minimum degree of care, such as failing to take any appropriate action to protect his or her child in order to establish that the parent allowed the abuse to happen.  See In re Mary S., 720 N.Y.S.2d 568, 569-70 (App. Div., 3d Dept. 2001) (noting that respondent's characterization of the friend's criminal sexual conduct with [her child] as "just fooling around" demonstrates that her "understanding of the duties associated with caring for [her] children was fundamentally flawed") (quoting Matter of Nathaniel TT., 696 N.Y.S.2d 274, 277 (App. Div., 3d. Dept. 1999)).

The Cross-Defendants argue, in various forms, that the New York Court of Appeals' Decision in Catherine G. v. County of Essex, 3 N.Y.3d 175 (2004) established that the Cross-Defendants owed no duty to report the abuse at issue in this case, and thus that the Cross-Defendants could not have breached a duty to Plaintiffs.  Under the holding in Catherine G., there

8

was no statutory duty to report Anthony, as he was not a "person legally responsible" for his sisters' care within the meaning of the New York Social Services Law.  3 N.Y.3d at 179.  Additionally, the Catherine G. court held that even if Anthony had been legally responsible for his sisters' care, he could not be the subject of a report within the meaning of the mandated reporter statute.  Id. at 180. Defendants argue that even if there was no statutory duty to report Anthony, the Cross-Defendants may have breached their statutory duty to report Ms. Page for failing to take adequate steps to assure her daughters were safe.[2]  They also argue that even if the Cross-Defendants did not have a statutory duty to report, they could still be liable in contribution if they had a common law duty of care to Plaintiffs and breached that duty in their handling of the situation.

The Court will address the Cross-Defendants' Motions in turn.

### 1.      Nancy Lewis and the Crisis Center

### a.      Background

Nancy Lewis ("Lewis") began working as a counselor with the Crisis Center of Clinton, Essex and Franklin Counties, Inc. ("Crisis Center") on October 20, 2000.  Deposition of Nancy Lewis ("Lewis Dep.") at 8.  (Dkt. No. 81, Ex. F.).  In the fall of 2000, the Crisis Center received a referral from Dr. Randy Quayle, a School Psychologist, to the effect that Brittany had reported to her mother that she had been touched inappropriately by her older brother.  See id. at 18-19.  As a result of this referral, Lewis started working with Brittany on October 30, 2000, and saw Brittany on a weekly basis.  Id. at 17.  Lewis testified at her deposition that she did not recall ever discussing

---

[2] While the Court of Appeals, per its Mandate, upheld the dismissal of Plaintiffs' claims against Defendants regarding mandated reporter issues, the Mandate did not address the role of the Cross-Defendants in this matter.  Accordingly, this Court must address whether the Cross-Defendants violated their statutory duty to report Ms. Page.

with Brittany the allegations against Anthony during her counseling sessions with Brittany.  Id. at 27-28.

On December 4, 2000, Dr. Quayle called a meeting at St. Agnes School regarding Brittany, who was a student at St. Agnes at the time.  Lewis Dep. at 29.  The meeting was attended by Dr. Quayle as well as Nancy Lewis, Paul Ruggieri (the Principal at St. Agnes), and at least two teachers from St. Agnes.  Id. at 28-29.  Lewis testified that she didn't "remember what the topic was going to be."  Id. at 29-30.  She further testified that she could "only remember certain sentences of what was said at the meeting" and that she didn't "remember a lot of what was discussed."  Id. at 30.  When asked at her deposition whether she ever discussed with Dr. Quayle the issue of Brittany being touched inappropriately, Lewis replied that she didn't remember.  Id. at 30-31.  She testified that at the meeting, she "felt like a lot of information was out there and nobody was doing anything about" it, but she couldn't remember whether there was any discussion at the meeting about Brittany having been touched inappropriately.  Id. at 32.  Lewis testified that she didn't think she had ever discussed the inappropriate touching with Dr. Quayle, or talked to Dr. Quayle about her counseling sessions with Brittany.  Id. at 32-33.

At some point in December 2000, Lewis had a conversation with Brittany that led her to believe that something inappropriate was occurring.  Lewis Dep. at 35-36.  In response, she conferred with her supervisor at the Crisis Center and made a call to the Hotline to report her belief.  Id. at 38, 49.  The Hotline would not accept the call.  Id. at 38.  Lewis then called Essex County Child Protective Services, and was informed that an employee was on the way to the Page home to complete an investigation.  Id. at 39.

**b.**    **Discussion**

10

Defendants allege that Lewis breached her duty as a mandated reporter by failing to report Ms. Page. Defendants also allege that Lewis breached her duty of care to Brittany by, *inter alia*, failing to discuss Brittany's allegations of sexual abuse during their counseling sessions and failing to take appropriate actions following the December 4 meeting. In addition, Defendants allege that the Crisis Center breached its duty to Brittany by its failure to properly train Lewis prior to Lewis beginning counseling sessions with Brittany.

The Court concludes as a matter of law that Lewis did not breach her statutory duty as a mandated reporter. Lewis contends that she fulfilled her duty to Brittany by contacting the Hotline and by contacting Child Protective Services. In response, Defendants have failed to produce evidence upon which a reasonable jury could conclude that Lewis possessed sufficient information about Ms. Page's alleged failure to protect her children as to require Lewis to make a separate report against Ms. Page.

The Court also concludes that Lewis and the Crisis Center are entitled to summary judgment on Defendants' claims that Lewis breached her common law duty and that the Crisis Center failed to properly train Lewis.[3] During the time she worked with Brittany, Lewis was not a licensed therapist, social worker, psychologist, or mental health professional. Lewis Aff. ¶ 11 (Dkt. No. 190). Defendants have failed to provide sufficient evidence of the standard of care applicable to Lewis as an unlicensed crisis counselor. See John v. Great Neck Union Free School Dist., 42 A.D.3d 437, 438 (App. Div., 2d Dept. 2007) (citing De Maria v. Renee Operating Corp., 282 A.D.

---

[3] Per Order dated April 22, 2009, the Court granted the Defendants and Cross-Defendants Nancy Lewis and the Crisis Center leave to provide the Court with supplemental briefing addressing the scope of the common law duty owed by Nancy Lewis to Plaintiff Brittany. Dkt. No. 184. The parties provided that briefing within the time frame established by the Court's Order. Defs.' Br. (Dkt. Nos. 194); Lewis and the Crisis Center's Br. (Dkt. Nos. 190-91).

221 (App. Div., 1st Dept. 1953)).  The New York Court of Appeals has noted that "'[o]rdinarily, the opinion of a qualified expert that a plaintiff's injuries were caused by a deviation from relevant industry standards would preclude a grant of summary judgment in favor of the defendants[.]'" Diaz v. New York Downtown Hosp., 99 N.Y.2d 542, 544 (2002) (quoting Murphy v. Conner, 84 N.Y.2d 969, 972 (1994)) (other citation omitted).  However, "[w]here the expert's ultimate assertions are speculative or unsupported by any evidentiary foundation, . . .  the opinion should be given no probative force and is insufficient to withstand summary judgment[.]"  Diaz, 99. N.Y.2d at 544 (citations omitted).

     In opposition to Lewis and the Crisis Center's Motion, Defendants rely upon an expert affidavit by Dr. Susan Cox, Ph.D., a psychologist, which criticizes several aspects of Lewis's handling of her counseling with Brittany.  Cox Aff. (Dkt. No. 138, Attach. 1).  Dr. Cox opines that Lewis deviated from the applicable standard of care by failing to ask Brittany about the incidents with Anthony, failing to inquiry about Anthony's whereabouts, and failing to inquire about Brittany's home circumstances.  Id. ¶ 5-8.  However, Dr. Cox's affidavit does not include a factual foundation for her assertions regarding the standard of care applicable to unlicensed crisis counselors.  Neither Dr. Cox's affidavit nor Defendants' memorandum cites any professional guidelines, regulations, pertinent case law, or other sources to support Dr. Cox's conclusory assertions regarding the standard of care.  Accordingly, Dr. Cox's affidavit is insufficient to overcome Lewis and the Crisis Center's Motion for summary judgment.  See Diaz, 99 N.Y.2d at 545 (where the plaintiff's expert "failed to provide any factual basis for her conclusion that the guidelines establish or are reflective of a generally-accept standard or practice in hospital settings . . . the expert's affirmation lacked probative force and was insufficient as a matter of law to overcome

12

the hospital's motion for summary judgment[.]").

The Court likewise finds that Defendants have failed to produce sufficient evidence to show that the Crisis Center's training of Lewis was inadequate, or that the lack of training caused harm to Brittany. Again, Dr. Cox's statements regarding the alleged lack of training are conclusory and do not reference any sources for how much training is required for unlicensed counselors such as Lewis. Accordingly, the Court grants Lewis and the Crisis Center's Motion for summary judgment.

### 2. Lake Placid Central School District, Robert Schiller and Randy Quayle, Ph.D.

### a. Background

Robert Schiller ("Principal Schiller") was the principal of the middle/senior school in the Lake Placid Central School District ("the School District") where Anthony was enrolled during the 2000-2001 school year. See Deposition of Robert Schiller ("Schiller Dep.") at 6, 17 (Dkt. No. 81, Attach. 13). Randy Quayle, Ph.D. is a School Psychologist employed by the Lake Placid Central School District. Quayle Aff. ¶ 3(Dkt. No. 82, Ex. J). Although St. Agnes School is not located within the School District, Dr. Quayle also provides psychological testing services to students at St. Agnes School pursuant to an agreement between the School District and St. Agnes. Id.

Principal Schiller testified that he first became aware of the possible abuse of Plaintiffs during a phone call with Ms. Page in which she told him that Anthony would no longer be in school, as he was going to be sent away from home. Id. at 11. He denied that Dr. Quayle had ever talked to him about the matter until a lawsuit had been filed. Id. at 12-14.

Dr. Quayle testified at his deposition that he first spoke to Ms. Page regarding Brittany on September 20, 2000. Quayle Dep. at 34. Ms. Page told him about Brittany's note indicating that Anthony had touched her. Id. at 36. Ms. Page also indicated that she was uncertain about whether

the touching was in the course of playing, fighting, or inappropriate touching.  Id. at 39-40.

Dr. Quayle told Ms. Page that he would arrange counseling for Brittany, and that he would work on getting counseling for Anthony.  Page Dep. at 173-74.  On October 16, Dr. Quayle spoke with Ms. Page by telephone.  Quayle Dep. at 48.  She requested a referral to the Crisis Center and assured Dr. Quayle that Anthony was not having unsupervised contact with Brittany.  Id. at 48-49, 53, 87.  Quayle referred Brittany to the Crisis Center on October 18, 2000.  See Lewis Dep. at 18-19.  In early December 2000, Dr. Quayle called a meeting about Brittany at St. Agnes School, as discussed above.

On January 29, 2001, Ms. Page telephoned Dr. Quayle and advised him that a case worker from Essex County Child Protective Services was investigating the matter.  Quayle Dep. at 104.  On or about February 6, 2001, Ms. Page advised Dr. Quayle that she had called the state police, and Anthony had confessed to sexually molesting Brittany.  Id.

Other than these conversations with Dr. Quayle and Principal Schiller, Ms. Page had no conversations with anyone from the Lake Placid Central School District about these events until after Anthony had left the Page home.  Page Dep. at 190-91.

### b.    Discussion

The Court finds that summary judgment is appropriate as to the Cross-Claims against Principal Schiller, as no reasonable trier of fact could find that Principal Schiller breached a duty to Plaintiffs.  The only evidence Defendants cite regarding Principal Schiller's involvement in this matter was the telephone call he received from Ms. Page, in which she informed him that Anthony would no longer be in school, as he was being sent away from home.  However, Ms. Page did not send Anthony away from home until early February, after all of the incidents of abuse had already

occurred.  Thus, the Court fails to see how any action or inaction by Principal Schiller at that time

contributed in any way to Plaintiffs' injuries.

The Court also finds that the cross claims against Dr. Quayle must be dismissed, as there are

no triable issues of fact as to whether Dr. Quayle violated either a common law or statutory duty.

Looking at the facts in the light most favorable to the nonmoving party, no reasonable jury could

conclude that Dr. Quayle possessed sufficient information about Ms. Page's alleged failure to

protect her daughters that would have warranted him reporting her to the Hotline, or that he

otherwise breached any duty to Brittany.  Nancy Lewis's testimony regarding the December 4, 2000

meeting fails to raise any triable issues of fact regarding Dr. Quayle's duty to report Ms. Page, as

nothing in her testimony shows that Dr. Quayle possessed information regarding Ms. Page that

could have formed a reasonable basis for a duty to report her for failing to protect her daughters.

Moreover, Lewis testified that she called the Hotline in response to a conversation with Brittany,

not because of what she learned at the December 4 meeting.

Finally, Defendants have failed to establish a triable issue of fact as to the School District's

liability in this matter.  As Defendants do not allege any involvement by School District personnel

other than Principal Schiller and Dr. Quayle with issues pertaining to Plaintiffs' abuse, the dismissal

of all claims against Principal Schiller and Dr. Quayle necessitates dismissal of the claims against

the School district.

### 3.        St. Agnes School and the Diocese of Ogdensburg

#### a.        Background

Plaintiff Brittany was a student at St. Agnes School ("St. Agnes") during the 2000-2001

academic year.  The Roman Catholic Diocese of Ogdensburg ("the Diocese") alleges that St. Agnes

is a separately incorporated Catholic school located with the geographic bounds of the Diocese.

Reply at 2 (Dkt. No. 145).  As discussed above, Dr. Quayle called a meeting at St. Agnes on

December 4, 2000 to discuss Brittany.

      **b.**       **Discussion**

St. Agnes argues that it owed no duty to protect Plaintiffs from abuse by their half-brother

occurring outside the school.  Schools owe their students a common law duty of care "to adequately

supervise the students in their charge and they will be held liable for foreseeable injuries

proximately related to the absence of adequate supervision."  Mirand v. City of New York, 84

N.Y.2d 44, 49 (1994).  However, this common law duty does not extend to acts committed while

the student was not "in the custody and control of school officials."  Kimberly S.M. v. Bradford

Central School, 226 A.D.2d 85, 88 (App. Div. 4th Dept. 1996).  Because there are no allegations

that Plaintiffs were abused while on school grounds or otherwise while within the custody or control

of school officials, there was no common law duty by St. Agnes regarding the incidents of abuse

against Plaintiffs.  Thus, St. Agnes could only be held liable for contribution if the school violated a

statutory duty to report Ms. Page for failing to protect her daughters from abuse.

At the deposition, Dr. Cox testified that St. Agnes had not deviated from any standard of

care in this matter.  Cox Dep. at 185-87 (Dkt. No. 109, Attach. 7).  However, Dr. Cox later

submitted an affidavit in which she asserted that any attendees at the December 4 meeting,

including St. Agnes personnel, had deviated from the applicable standard of care as mandated

reporters.  Cox. Aff. ¶¶ 12-17.  St. Agnes argues that the affidavit of Dr. Cox should not be

considered by the Court, as the affidavit contradicts Dr. Cox's deposition testimony.  It is well

settled in the Second Circuit that on a motion for summary judgment, a court should not consider a

party's affidavit to the extent the affidavit contradicts a party's prior deposition testimony.  See

Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987).  Thus, to the extent that Dr. Cox's

affidavit contradicts her prior deposition testimony, Defendants cannot rely on the affidavit in

opposition to St. Agnes and the Diocese's Motion for summary judgment.

On the Court finds St. Agnes and the Diocese are entitled to summary judgment, as there is no

triable issue of fact and Defendants have failed to produce any evidence from which a reasonable

jury could conclude that the school violated its statutory duty.  Nancy Lewis's testimony regarding

the December 4, 2000 meeting fails to raise any triable issues of fact regarding mandated reporter

issues for the same reasons as described above regarding Dr. Quayle.  Nothing in her testimony

shows that any school personnel possessed information regarding Ms. Page that could have formed

a reasonable basis for a duty to report her for failing to protect her daughters.  According, the Court

grants the Motion brought by St. Agnes and the Diocese.[4]

### 4.        The County Cross-Defendants

#### a.        Background

On October 17, 2000, Ms. Page contacted Essex County Mental Health about her concerns

that Anthony had inappropriately touched Brittany.  At that time, Defendant Julie Ferguson

("Ferguson") was an intake coordinator at Essex County Mental Health.  Deposition of Julie

Ferguson ("Ferguson Dep.") at 4 (Dkt. No. 81, Attach. 17).  Ferguson testified that in her capacity

as intake coordinator, her responsibility was to provide services and referrals.  Id. at 32.  Ferguson

---

[4] The Diocese argues further that summary judgment is appropriate as to the Cross-Claims against them, as Defendants have failed to establish a sufficient link between the Diocese and the events in this case, or that the Diocese and St. Agnes operated in a principal-agent relationship.  As all claims against St. Agnes and the Diocese are being dismissed, the Court need not consider whether any liability on the part of St. Agnes could have been imputed to the Diocese.

testified that she spoke with Ms. Page for approximately forty minutes, and that Ms. Page was requesting services for Anthony.  Id.  After the discussion, Ferguson discussed the case with her supervisor, and talked to Ms. Page within a week of their initial conversation.  Id. at 35-40. Ferguson referred her to Families First, an organization in Essex County, and to private practice.  Id. at 17-18, 38, 42-43.  Ferguson believed that Ms. Page, who had health insurance, could receive services faster through private practice than through direct services by Essex County Mental Health. See id. at 17-19, 38, 41.  In December 2000, Ms. Page contacted Essex County Mental Health to inquire about Anthony's waiting list status for services.  See id. at 51-52.  Stephen Feinbloom, another employee with Essex County Mental Health, spoke to Ms. Page and reminded her of the plan to obtain counseling for Anthony through private practice, and for Ms. Page to contact Families First.  See id. at 51-52, 55.  The clinic sent Ms. Page a follow-up letter in December, outlining the referrals made to her in October.  Id. at 52.

Ms. Page also testified that after growing more concerned about the situation involving her daughters following her conversation with Brittany on or about January 31, 2001, she took her daughters to her friend's house that evening.  Page Dep. at 243.  The next day, she called Essex County Child Protective Services and spoke to Tim Pierce ("Pierce"), an employee with the agency. Id. at 243, 245.  She explained the situation involving her children, and said that she had removed the children from the household.  Id. at 246.  Pierce explained that he couldn't make a report against Anthony, and suggested that Ms. Page keep her daughters away from Anthony.  See id. at 246-47. The same day, Ms. Page also called Carrie Flynn ("Flynn"), who worked with the Probation Department in Essex County.  Id. at 248.  Flynn said that the Essex County Department of Social Services would have a meeting to see how they could help.  Id. at 249.  Flynn later called Ms. Page

18

back to tell her that the County was sending a social worker to the house to evaluate Anthony.  Id. at 249-50.  The next morning, Ms. Page took Anthony to her ex-husband's home in Rockland County. Id. at 252.  Ms. Page testified that she had later called Flynn back to thank her, and to tell her that she had gone to the police and had taken Anthony out of the household.  Id. at 255.

**b.    Discussion**

The Court concludes that all of the County Cross-Defendants are entitled to summary judgment.  Based upon the deposition testimony of Julie Ferguson and the other evidence in the record regarding Ferguson's contact with Ms. Page, there is no basis upon which a reasonable jury could conclude that Ferguson or Essex County Mental Health possessed sufficient knowledge of Ms. Page's alleged inability to protect Plaintiffs as to constitute a breach of a statutory duty. Moreover, even assuming that the limited contact that Essex County Mental Health had with the situation would have created a common law duty, there is no evidence upon which a reasonable jury could conclude that Ferguson or Essex County Mental Health breached such a duty.

The Cross-Claims against the other County Cross-Defendants must also be dismissed, as these agencies had either very limited contact with this matter, or only became involved after the Plaintiffs had been separated from Anthony.  Any involvement by Essex County, Essex County Department of Social Services or Essex County Child Protective Services that occurred after the Plaintiffs were removed from the same home as Anthony cannot be said to have contributed to

19

Plaintiffs' injuries.[5]  Thus, all Cross-Claims against the County and related agencies are dismissed.[6]

**D.     Costs and Attorney's Fees**

In their Cross-Motion for summary judgment, the County Cross-Defendants also requested costs and attorney's fees, although their Memorandum of Law did not address their entitlement to such relief.  Dkt. No. 124.  Lake Placid Central School District, Dr. Quayle and Principal Schiller also have requested that costs and attorney's fees be awarded, and address that issue in their Memorandum of Law.  Dkt. No. 82.

"It is settled law that a court may impose attorney's fees under its inherent power as a penalty for misconduct during the course of litigation."  Milltex Industries Corp. v. Jacquard Lace Co., 55 F.3d 34, 37-38 (2d Cir. 1995).  However, "sanctions are not appropriate unless the challenged actions are (1) 'entirely without color' and (2) motivated by 'improper purposes,' such as harassment or delay."  Id. (quoting Oliveri v. Thompson, 803 F.3d 1265, 1272 (2d Cir. 1986)).  In addition to this inherent power, 28 U.S.C. § 1927 provides that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.  "Section 1927 authorizes the imposition of sanctions only 'when there is a finding of conduct constituting or akin to bad faith.'"  State Street Bank and Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 180 (2d Cir. 2004) (quoting Sakon v. Andreo, 119

---

[5] In reference to the County Cross-Defendants, the Defendants' Counter-Statement of Material Facts focuses almost exclusively on Ms. Page's interactions with Julie Ferguson and Essex County Mental Health, rather than the other County Cross-Defendants.  See Dkt. No. 138, Attach. 3.

[6] Because the Court concludes that there are no triable issues of fact regarding the Cross Claims against the County and related agencies, the Court need not address the County Cross-Defendants' qualified immunity argument.

F.3d 109, 114 (2d Cir. 1997)).

The Court recognizes the frustration felt by all sides due to the long procedural history of this case. However, based upon its review of the record, the Court does not find sufficient grounds to conclude that the Defendants' attorneys have acted in bad faith, were motivated by improper purposes, or that the Cross-Claims were so lacking in merit, that the awarding of costs or attorney's fees would be appropriate. Accordingly, the Motions for such fees are denied. The trial in this matter will commence as scheduled on August 18, 2009.

III.    **CONCLUSION**

Based on the foregoing discussion, it is hereby

**ORDERED**, that the Cross-Motions for summary judgment and for judgment as a matter of law (Dkt. Nos. 82, 102, 108, 124, 160, 167, 171) brought by the Cross-Defendants are **GRANTED**, and that all Cross-Defendants are **DISMISSED** from this action; and it is further

**ORDERED**, that the Cross-Motions for costs and attorney's fees (Dkt. Nos. 82, 124, 167) brought by the County Cross-Defendants, Lake Placid Central School District, Randy Quayle, individually and Robert Schiller, individually are **DENIED**; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED**.

DATED:       May 13, 2009
             Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge