UNITED STATES DISTRICT COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

ELIZABETH MITRIONE, as guardian ad litem
on behalf of BRITTANY, Infant; and MELISSA, Infant,

                      Plaintiffs,

    -against-                                          1:02-CV-0526 (LEK/ RFT)

PATRICIA MONROE, M.D., and ADIRONDACK
INTERNAL MEDICINE AND PEDIATRICS, P.C.,

                      Defendants,

## **MEMORANDUM-DECISION AND ORDER**

Presently before the Court is a Motion by Defendants Patricia Monroe, M.D., ("Dr. Monroe") and Adirondack Internal Medicine and Pediatrics, P.C., ("Adirondack") for a new trial, made pursuant to Federal Rules of Civil Procedure 50(b) and 59.

**I.    BACKGROUND**

On August 18, 2009 through August 27, 2009, a jury trial was held before this Court in which Plaintiffs Elizabeth Mitrione, as Guardian Ad Litem on behalf of Melissa Page, and Brittany Page ("Plaintiffs") obtained a successful verdict and award of damages in the amount of $11,000,000 in a medical malpractice action against the Defendants. This trial occurred after an extended period of litigation arising from a Complaint filed by Plaintiffs[1] on April 16, 2002. Dkt.

---

[1] Catherine Page, the mother of Melissa and Brittany Page, was initially listed as a plaintiff, either in an individual or representative capacity; on May 18, 2009, the Court granted Plaintiffs' Motion to substitute Elizabeth Mitrione as the infant Plaintiff's guardian ad litem. Dkt. No. 202.

No. 1.  While the Complaint was initially brought against 14 Defendants, and a number of cross-claims were later made by the current Defendants against others, all Defendants other than Dr. Monroe and Adirondack (collectively, "Defendants") were terminated as parties to the action before the trial commenced.

The medical malpractice claim on which Plaintiffs prevailed at trial arose from a series of events which occurred during 2000 and 2001 involving the sexual abuse of the Plaintiff children by their half-brother, Anthony Mitrione.  On August 15, 2000, Catherine Page ("Ms. Page"), the mother of Plaintiffs Brittany and Melissa (at the time, ages nine (9) and seven (7), respectively) read an excerpt of Brittany's diary, in which Brittany wrote that she was "sad all the time because I've been touched in places I don't want to be touched."  Compl. ¶ 31.  Brittany then told her mother that her half-brother Anthony (at the time, age 14) had touched her genitals, over her clothes, on more than one occasion when he had first moved into the family home, a year prior.  Id.; Deposition of Catherine Page ("Page Dep.") at 60-61 (Dkt. No. 81, Attachs. 1-5, Ex. A).

Ms. Page then confronted Anthony, who claimed that he did not remember touching Brittany inappropriately, though if he did, it was accidental.  Page Dep. at 61-62.  Ms. Page thought that it was possible that Anthony was telling the truth.  Id. at 62.  However, because Ms. Page "wasn't going to sit and let it, you know, happen again without trying to do something" in case the touching was not accidental, she called the New York state hotline for reporting of child abuse or maltreatment.  Id. at 65. The Hotline staff told Ms. Page that they would not take her name to register a report, because the situation was not a matter that they could handle.  Id. at 66.

Ms. Page subsequently called Patricia Monroe, M.D., a pediatrician at Adirondack Internal Medicine and Pediatrics, P.C., who had treated Plaintiffs, as well as Anthony, in the past.  Page

2

Dep. at 68-69; Medical Records (Dkt. No. 81, Attach. 10, Ex. C1). Ms. Page told Dr. Monroe what Brittany had alleged and Anthony's response. Page Dep. at 69. Ms. Page also told Dr. Monroe that Brittany would be staying at her aunt's house for the next week. See Deposition of Patricia Monroe, M.D. ("Monroe Dep.") at 53-54 (Dkt. No. 81, Attach. 8, Ex. B). Dr. Monroe advised Ms. Page not to leave Brittany alone with Anthony. Page Dep. at 69-70. Dr. Monroe also asked Ms. Page to bring Brittany in if Brittany would be willing to talk to Dr. Monroe. Id. at 72. Ms. Page did not do so because Brittany expressed that she did not want to go. Id. at 72-74.

On or about January 31, 2001, after Brittany reacted angrily to Anthony's suggestion that he accompany her down the street on an errand, Ms. Page "knew that something had happened" and talked to Plaintiffs as well as her other daughters living in the house. Page Dep. at 76-79. The next day, Page called the Hotline and was again told that there was nothing they could do. Id. at 79. Ms. Page again questioned Anthony, but he denied any inappropriate contact with his sisters. Id. at 79-80. Ms. Page called numerous agencies, and also called Dr. Monroe, who asked Ms. Page to bring Plaintiffs in for an examination. Id. at 80-82. The state police had also contacted Dr. Monroe and asked her to evaluate Brittany for suspected sexual abuse. Monroe Dep. at 99. Ms. Page brought Plaintiffs to Dr. Monroe's office and told Dr. Monroe that Plaintiffs had just disclosed additional and more severe instances of sexual abuse against them, committed by Anthony. Medical Records at 11. Dr. Monroe confirmed the stories with Plaintiffs and physically examined them. Id. at 9-11. At that time, Ms. Page told Dr. Monroe that she had begun working nights and leaving the children with a 19-year old babysitter, Elizabeth Mitrione. Id. at 11. On February 6, 2001, Dr. Monroe reported Ms. Page to the State Central Register for failure to supervise the children adequately. Id. Ms. Page brought Anthony to stay at his father's home within two or three days after Ms. Page

3

confronted Anthony on or about January 31, 2001. Page Dep. at 85, 88. Anthony later admitted having inappropriate contact with Plaintiffs on numerous occasions. See generally Deposition of Anthony Mitrone (Dkt. No. 109, Attach. 2).

In their Complaint, Plaintiffs alleged that Dr. Monroe violated a statutory duty to report the abuse, in that she had reasonable cause to suspect that Ms. Page was allowing the abuse to happen. Pls.' Mem. of Law (Dkt. No. 119) at 8. They further alleged that Dr. Monroe was negligent in failing to identify the extent of the abuse or conduct physical evaluations that would have revealed the extent of the abuse at an earlier date. Id. at 17. The Plaintiffs made claims against Adirondack on theories of negligent supervision and training, *respondeat superior*, and that Adirondack also had the statutory duties of a mandated reporter.

In a May 16, 2007 Decision and Order, this Court granted Defendants' Motion for summary judgment. Dkt. No. 151. On appeal, however, this ruling was affirmed in part and reversed in part. Per a Mandate dated December 23, 2008, the Second Circuit affirmed the dismissal of Plaintiffs' claims that Defendants owed and violated a statutory duty to report Ms. Page to the Hotline for allowing the abuse of her children. The Second Circuit noted that "at the time of the initial reports of abuse [in August 2000], Dr. Monroe had no reason to believe that Catherine Page was neglecting her duty to protect her daughters from abuse." Mandate at 4. As to Plaintiffs' claims of medical malpractice, the Second Circuit reversed the grant of summary judgment for the Defendants, noting that

> Page offered evidence that created at least an inference that had Dr. Monroe herself contacted the Child Protective Services or law enforcement authorities, those authorities would have intervened to stop Anthony's abuse of his half-sisters at some point before February 2001. Accordingly, Page has demonstrated a genuine issue of material fact with respect to whether Dr. Monroe's alleged deviations from the

4

standard of care were the proximate cause of the girls' injuries . . . .

Mandate at 6-7.

Thereafter, the case proceeded on the question of Defendants' alleged negligence, while the issue of a violation of statutory reporting duties was dropped. On May 13, 2009, the Court entirely granted cross-Defendants' Motion for summary judgment on the cross-claims that Dr. Monroe and Adirondack had brought against them. Dkt. No. 201. These cross-Defendants were parties who had initially been named as Defendants by Plaintiffs but had subsequently been terminated by stipulation. In dismissing the cross-claims, the Court concluded, *inter alia*, that as a matter of law Nancy Lewis, a counselor at the Crisis Center of Clinton, Essex and Franklin Counties, Inc., did not, as Monroe and Adirondack alleged, breach a duty as a mandated reporter or breach a duty of care, and that the Center did not breach a duty by failing to properly train Lewis. Id. Lewis and the Center were involved in the case after a referral by Brittany's school psychologist, whereupon Lewis started working with Brittany on October 30, 2000, and subsequently saw Brittany on a weekly basis.

After an unauthorized attempt by Defendants to appeal this ruling as to Lewis, the Court denied their Motion for a certificate of appealability on August 11, 2007. Dkt. No. 247. The case proceeded soon thereafter to trial, with jury selection and opening statements occurring on August 18, 2009. At conference, the Court denied Defendants' Motion to bifurcate the liability and damages portions of the trial. Consistent with the verdict returned by the jury on August 27, the Court entered Judgment in favor of the Plaintiffs on August 28, with the Defendants liable to the Plaintiffs for $11,000,000. Defendants moved for judgment as a matter of law at several junctures. Transcripts. Dkt. Nos. 297 at 178; 299 at 206; 300 at 129. The Court granted an extension of time

for post-trial motions, and the Defendants made the instant Motion for a new trial on September 4, 2009. In the affidavit of attorney Kelly Monroe submitted with the Motion, Defendants term the relief they seek as "judgment as a matter of law and/or a new trial, pursuant to FRCP 50(b) and/or 59 and/or N.Y.N.D. L.R. 7.1(g) . . . . [or, in the alternative,] that the jury award of damages be reduced by the Court as excessive . . . ." Dkt No. 288 Attachment No. 1. In the memorandum of law submitted with the Motion, Defendants advance arguments in support of a new trial, and the memorandum concludes with the request that the "verdict should be set aside and a new trial ordered." Dkt. No. 288 at 5. The Court turns now to that Motion.

**II.   DISCUSSION**

*a. Standard of Review*

Federal Rule of Civil Procedure 50(b) specifies that a "movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59." A court considering a renewed motion under this provision may allow judgment on the verdict, order a new trial or direct the entry of judgment as a matter of law. FED. R. CIV. P. 50(b). Rule 59 allows a court to "on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A).

In reviewing Defendants' Rule 50(b) Motion, the Court "must view the evidence in a light most favorable to the non-movant and grant that party every reasonable inference that the jury might have drawn in its favor." Merrill Lynch Interfunding, Inc. v. Argent, 155 F.3d 113, 120 (2d Cir. 1998). The Court "may not itself weigh the credibility of witnesses or consider the weight of the

evidence." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 286 (2d Cir. 1998). Thus, judgment as a matter of law should be granted in favor of the moving party only when "the evidence, viewed in the light most favorable to the nonmoving party is insufficient to permit a reasonable juror to find in [the non-moving party's] favor." Arlio v. Lively, 474 F.3d 46, 51 (2d Cir. 2007). This means that the Court must identify either "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the defendants]." See Galdieri-Ambrosini, 136 F.3d at 289. A Rule 50(b) motion, which renews Defendants motions at trial under Rule 50(a), may only argue for judgment on grounds limited to those that were specifically raised previously. Id. at 286.

In contrast with the very demanding standard for a Rule 50 motion, with a motion for a new trial pursuant to Rule 59, "a trial judge hearing a motion for a new trial 'is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner.'" Song v. Ives Laboratories, Inc., 957 F.2d 1041, 1047 (2d Cir. 1992) (quoting Benevivo v. Saydjari, 574 F.2d 676, 684-85 (2d Cir. 1978). "[A] new trial may be granted even if there is substantial evidence to support the jury's verdict." Id. As a general matter, the decision to grant a new trial is committed to the discretion of the trial judge, and a "motion for a new trial should be granted when, in the opinion of the district court, 'the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice.'" Id. (quoting Smith v. Lightning Bolt Production, Inc., 861 F.2d 363, 370 (2d Cir. 1988). The essential duty of a judge in reviewing a Rule 59 motion is to ensure that such a result or injustice does not occur. See Benevivo, 574 F.2d at 684 ("The trial judge, exercising a

mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence . . . and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result."). Accordingly, sufficient grounds for granting a new trial under Rule 59 may be broadly predicated on arguments demonstrating that a "trial was not fair to the party moving," or that there are "questions of law arising out of alleged substantial errors in admission or rejection of evidence or instructions to the jury." Aczel v. Labonia, No. 3:00-CV-01802, 2006 U.S. Dist LEXIS 68119 at *5 (D. Conn. Sept. 22, 2006) (quoting Charts v. Nationwide Mut. Ins. Co., 397 F. Supp. 2d 357, 374 (D. Conn. 2005).

*b. Retrial on Liability and Apportionment Thereof*

On Defendants' Motion pursuant to Rule 59, the Court finds that a new trial is warranted. While Defendants challenge a variety of rulings made in the course of trial, it is their argument that the Court erred in its treatment of non-parties to the suit which persuades the Court that a new trial is necessary. In short, controlling New York state law governing apportionment of fault in negligence actions was not properly applied at trial, and the Court did not permit the jury to consider the conduct of non-parties, which potentially nay reduce Defendants' liability. This omission and the possible consequences thereof are readily sufficient to meet the standard for a new trial under Rule 59. Further, the Court finds that, while the jury's determination of the total value of damages is not implicated by this error or any of Defendants' arguments, both the question of the Defendants' negligence and the question of apportionment of fault, the latter of which may affect the amount for which the Defendants may be found liable, require retrial.

Under 28 U.S.C. §1332, the Court exercises jurisdiction in this case based on the diversity of

the parties and amount in controversy; accordingly, the substantive law of New York, the forum state, must be applied. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941). New York enacted Article 16 of its Civil Practice Laws and Rules to "[l]imit[] the liability of persons jointly liable" in certain circumstances and thereby "remedy the inequities created by joint and several liability on low-fault, 'deep pocket' defendants." N.Y. C.P.L.R. 1601; Rangolan v. County of Nassau, 96 N.Y.2d, 42, 46 (2001). Article 16, in relevant part, operates to modify the common law rules of joint and several liability, such that a negligent joint tortfeasor whose fault is less than or equal to 50% of a plaintiff's non-economic loss may only be held liable for a share of that loss equal to the tortfeaser's percentage of fault. Section 1601 provides:

> Notwithstanding any other provision of law, when a verdict or decision in an action or claim for personal injury is determined in favor of a claimant in an action involving two or more tortfeasors jointly liable or in a claim against the state and the liability of a defendant is found to be fifty percent or less of the total liability assigned to all persons liable, the liability of such defendant to the claimant for non-economic loss shall not exceed that defendant's equitable share determined in accordance with the relative culpability of each person causing or contributing to the total liability for non-economic loss . . . .

N.Y. C.P.L.R. 1601.

While Article 16 contains a number of exceptions to its general rule, none are triggered by the claims or facts of the instant action so as to preclude the rule's application. Rather, review of New York case law confirms that Dr. Monroe and Adirondack are necessarily subject to the potential for limited liability of joint tortfeasors allowed under § 1601.

In Chianese v. Meier, 98 N.Y.2d 270 (2002), the New York Court of Appeals considered the application of Article 16 to the situation in which a tenant brought a negligence action against her landlord and building manager after being assaulted at her apartment by a non-party to the suit. The

9

question at issue was whether the intentional nature of the act by the non-party operated to affect apportionment of liability, as §1602 disallows intentional tortfeasors from availing themselves of apportionment; the court concluded that the nature of a third-party's culpability does not prevent apportionment of liability in the case of a negligent joint tortfeasor. Article 16 makes "low-fault tortfeasors [] liable only for their actual assessed share of responsibility, rather than the full amount of plaintiff's noneconomic loss . . . [and the fact t]hat a nonparty tortfeasor acted intentionally does not bring a pure negligence action within the scope of the exclusion." Id. at 275-277.

Similarly, the intentional tortious conduct of Anthony Mitrione does not prevent Defendants from obtaining apportioned liability for their alleged negligence. The Defendants asserted Article 16 apportionment as an affirmative defense, see Dkt. No. 15 at 2, in this case, and a retrial is necessary and justified under Rule 59 to correct the August trial's omission of the possibility of apportionment of fault and liability. See Benevivo, 574 F.2d at 684. Nonetheless, Plaintiffs argue that Article 16 does not apply because Anthony Mitrione and the Defendants should not be viewed as joint tortfeasors; it is Plaintiffs' contention that the Court should regard the Defendants and non-party or non-parties as successive tortfeasors, which would bring the Plaintiffs' negligence action outside of the purview of Article 16. This position must be rejected, however, as Plaintiffs clearly claim a joint tort in law and in fact.

New York law states the difference between joint and successive torts as follows. First, "[w]hen two tort-feasors neither act in concert nor contribute concurrently to the same wrong, they are not joint tort-feasors; rather, their wrongs are independent and successive. Suria v. Shiffman, 67 N.Y.2d 87, 98 (1986). "Although the original wrongdoer is liable for all the proximate results of his own tortious act, including aggravation of injuries by a successive tort-feasor, the successive tort-

feasor is liable only for the aggravation caused by his own conduct." Id.  Thus, a joint tort is committed when the actions of multiple tortfeaser occur in the same interval of time to create a harm.  Secondly, "[i]tis sometimes the case that tort-feasors who neither act in concert nor concurrently may nevertheless be considered jointly and severally liable.  This may occur in the instance of certain injuries which, because of their nature, are incapable of any reasonable or practicable division or allocation among multiple tort-feasors."  Ravo v. Rogatnick, 70 N.Y.2d 305, 310 (1987).

There can be no doubt that Plaintiffs' action alleges that Defendants are joint tortfeasors with, *inter alia*, Anthony Mitrione.  From the time at which Defendants are alleged to have been negligent and on the occasions thereafter when Defendants are alleged to have been negligent so as to facilitate the continued abuse of the Plaintiffs by Anthony Mitrione, that abuse existed as a single, indivisible harm caused by the joint actions of the Defendants and Anthony Mitrione.  No harm is attributable to Defendants independent from the sexual abuse inflicted by Anthony Mitrione after Defendants' claimed negligence.  Accordingly, it is impossible to locate a primary and successive tortfeaser in the facts of the case.  There is only the abuse inflicted by Anthony Mitrione before the Defendants became involved and the abuse committed thereafter, with the instant case concerning itself solely with the latter harm.  In confirmation of this Court's analysis, Chianese v. Meier, 98 N.Y.2d 270 (2002), discussed above, is analogous in terms of the form of the joint tort comprising the underlying claim; the plaintiff sued based on the negligence of those operating the plaintiff's apartment in creating conditions which allowed the assailant to harm her.  Lastly, as the claim in the instant case has sought all along to hold the Defendants jointly and severally liable for the abuse attributable to their negligence, and the jury verdict reflects that claim, it is plainly untenable to now

construe Defendants' conduct as a successive tort in order to avoid retrial.

*c. The Damages Award*

Given the Court's ruling on the Article 16 issue, the Defendants' various challenges concerning evidentiary rulings and instructions at trial are largely moot. The Court shall not retain the finding of negligence made in the August trial, as the proceedings broadly included treatment of evidence relating to non-parties to the suit that reflected the Court's omission of Article 16. In this situation, the Court finds it appropriate to have a jury determine both the question of liability and the extent of liability, rather than isolating and hearing just the question of extent. A new trial shall be held to answer whether Defendants were at fault, and if so, what share of the value of Plaintiffs' non-economic harm is properly attributable to Defendants. See Morales v. County of Nassau, 94 N.Y.2d 21, (1999) (upholding appellate court's decision ordering a new trial where trial court failed to apply Article 16).

The $11,000,000 damages award for the value of Plaintiffs' injury is not subject to retrial, however, as the sum is not implicated by either the Article 16 issue or other challenges raised by Defendants.[2] Per Rule 59(a), a court may "grant a new trial on all or some of the issues," and it is proper for the retrial to exclude matters where "the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice." Gasoline Prods. Co. v. Champlin Ref. Co., 283 U.S. 494, 500 (1931); see also Brooks v. Battleboro Memorial Hosp., 958

---

[2]Defendants contend that speculative testimony was allowed regarding damages, but the Court does not find this argument sufficient to require a retrial of the jury's valuation of the Plaintiffs' injury for which Defendants were found to be a proximate cause. Nor does the Court's decision not to bifurcate the trial present grounds for retrial of the total damages figure.

F.2d 525, 530 (2d Cir. 1992). In the instant case, Defendants' fault and the apportionment thereof are separate issues from the total damages award; Defendants were held liable for the total value of Plaintiffs' injury for which Defendants were found to be a proximate cause. See Special Verdict Form, Dkt. No. 279. On retrial, a jury will determine whether and how much Defendants were at fault, such that if Defendants are found to be at fault for less than 50% of the Plaintiffs' non-economic losses, that fault percentage will correspond to their share of damages owed from the $11,000,000 total sum. See Cappellini v. McCabe Powers Body Co., 713 F.2d 1 (2d. Cir. 1983) (ordering a retrial only on apportionment, while retaining total damages valuation).

Lastly, Defendants seek to set aside the damages award on the grounds that it "deviates materially from what would be reasonable compensation." See N.Y. C.P.L.R. § 5501(c); Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 418-25 (1996) (when sitting in diversity, federal courts apply state law in evaluating the size of a verdict). "A district court applying this standard 'reviews the evidence presented at trial in support of the challenged damage award and compares the award to other New York cases in which evidence of similar injuries was presented.'" Rangolan v. County of Nassau, 370 F.3d 239, 244 (2d Cir. 2004) (quoting Presley v. United States Postal Service, 317 F.3d 167, 173 (2d Cir. 2003). A finding that the damages awarded are excessive under the relevant standard allows a court the discretion to retry the damages issue or condition a retrial on the prevailing party's refusal to accept a reduced award. Id.

The Court shall consider Defendants' challenge to the total size of the damages verdict, which the jury valued at $11,000,000 for Plaintiffs' injuries proximately caused by the Defendants. Given the Court's retrial decision based on the application of apportionment under Article 16, the actual damages for which Defendants may be liable have yet to be established at this time. At

13

present, the Court turns to whether the August jury's determination of the value of Plaintiffs' losses "deviate[] materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c).

The returned special verdict form shows that, with respect to Brittany Page, $2,000,000 was awarded for pain and suffering from August 16, 2000 until the time of the verdict, and $4,000,000 was awarded for pain, suffering and permanent injury for a period of 62 years into the future. With respect to Melissa Page, $2,000,000 was award for pain and suffering from August 16, 2000 until the time of the verdict, and $3,000,000 was awarded for pain, suffering and permanent injury for a period of 64 years into the future. The Defendants and Plaintiffs, of course, each cite to prior New York verdicts which they argue show the deviance and congruence, respectively, of the verdict in this case. This Court's review of New York cases with facts and verdicts that bear on the instant case reveal that the $11,000,000 valuation of total damages is not a material deviation from reasonable compensation for Plaintiffs.

In C.A. and C.P. v. St. Raphael Roman Catholic Church, et al, a jury in Nassau County awarded $11,400,000 to a male and female plaintiff who were aged 14 and 15 at the time that they were sexually abused by the head of the church's youth ministry for a period of years. See 24 JURY VERDICT REVIEW PUBLICATIONS, Issue 6 (2007). The jury found that the church was 30% at fault for the plaintiffs' harm, which included pain and suffering and post permanent post-traumatic stress disorder, on the basis of reckless hiring; because recklessness is an exception to Article 16 apportionment, the church was liable for the whole amount. The jury's award compensated the female for 12 years of future harm and the male was compensated for 30 years of future harm. Given the similarity in injury and award, this verdict clearly supports the $11,000,000 verdict against Defendants. Based on the younger age of the Plaintiffs during their abuse and the proof

14

offered to identify their continuing harm over a period longer than that compensated in the St. Raphael Roman Catholic Church case, there is no apparent deviance in the instant case.

Further, in the 2002 case of Johnson v. NYCHA, in which a Kings County jury awarded approximately $5.1 million to a woman for past and future pain and suffering, including psychological trauma, after an intruder into her apartment beat and sexually abused her; the defendant apartment owner was held liable because the intruder entered through a defect in the building of which the defendant had repeatedly been made aware. See 19 JURY VERDICT REVIEW PUBLICATIONS, Issue 6 (2002). Thus, as in the instant case, a large award for future harm ($4,000,000 here) was made based on evidence of prospective psychological damage. The Court again finds that the $11,000,000 award to the Plaintiffs does not appear to materially deviate from reasonable compensation as measured by an existing verdict.

A final example is L.A. v. Port Jervis Housing Authority, where an Orange County jury awarded $3,000,000 to an 81 year old woman, approximately $2,000,000 of which was for future damages over 8 years. See 15 JURY VERDICT REVIEW PUBLICATIONS, Issue 5 (1998). In that case, the woman was suing the housing authority for negligence after being raped by an intruder. This verdict is consistent with the $11,000,000 verdict in the instant case, given that there are two Plaintiffs, their abuse occurred over a prolonged period, was carried out by a family member, and it happened during formative years. It is clear that juries in New York, in the context of negligence actions, may award significant future damages for psychological trauma such as post-traumatic stress disorder. The Court does not find grounds to second-guess the jury's valuation of the harm experienced the harm to be experienced by the Plaintiffs in light of other New York verdicts in comparable cases.

Defendants' cited New York cases, namely <u>McKay v. Ciani</u>, 288 A.D.2d 587 (3rd Dept. 2001), <u>Laurie Marie M. v. Jeffrey T.M.</u>, 159 A.D.2d 52 (2d Dept. 1990) do not persuade the Court that the August jury created a material deviation in the amount of the total award.  The facts in these cases, including the underlying injuries, significantly differ from the present case, with the harm suffered by Plaintiffs demonstratively greater.  Further, while it is possible to find cases where smaller verdicts were returned in cases of sexual abuse, that simply does not show that the jury in the present case came to an anomalous result, when other cases show very similar awards. Rather, it is the nature of sexual abuse claims involving questions of prospective and permanent psychological harm that jury verdicts will range in value.  Accordingly, the Court shall not upset the jury's assessment of Plaintiff's damages, and their finding of an $11,000,000 total shall be retained in the retrial that this Court hereby orders.

### IV.    CONCLUSION

For the foregoing reasons, it is

**ORDERED**, that Defendants' Motion for a new trial is **GRANTED in part** and **DENIED in part**, consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that a retrial shall be held on issues of liability and apportionment thereof; and it is further

**ORDERED**, that a conference be arranged at a time of convenience for the parties to discuss further proceedings; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on the parties.

**IT IS SO ORDERED**.

DATED:    April 19, 2010
          Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge